PALM BEACH COMPANY, Plaintiff,

v.

JOURNEYMEN'S AND PRODUCTION ALLIED SERVICES OF AMERICA AND CANADA INTERNATIONAL UNION LOCAL 157, Vincent Gulino, Henry Fineguerra, and Tahari, Ltd., Defendants.

No. 81 Civ. 3702(RJW).

United States District Court,
S. D. New York.

July 31, 1981.

Phillips, Nizer, Benjamin, Krim & Ballon, New York City, for plaintiff; Marc L. Silverman, David L. Bressman, Ruth D. Raisfeld, New York City, of counsel.

Lloyd Somer, New York City, for defendants Journeymen's and Production Allied Services of America and Canada International Union Local 157, Vincent Gulino, and Henry Fineguerra.

Herman E. Cooper, P. C., New York City, for defendant Tahari, Ltd.; Jonathan L. Sulds, New York City, of counsel.

## OPINION

ROBERT J. WARD, District Judge.

This action was commenced in the Supreme Court of the State of New York, New York County ("the state court"), by

Palm Beach Company ("Palm Beach"), a corporation organized under the laws of the State of Maine and having its principal place of business in Cincinnati, Ohio. Palm Beach is engaged, through its Evan-Picone Division, in the women's apparel business. The complaint filed in this action alleges that Local 157 of the Journeymen's and Production Allied Services of America and Canada International Union ("Local 157"), in conspiracy with the other named defendants, has engaged and continues to engage in picketing activities that constitute a tortious interference with Palm Beach's business relations, in violation of common law.[1] Palm Beach seeks both monetary damages and injunctive relief on account of this allegedly unlawful conduct.

In an *ex parte* temporary restraining order signed June 11, 1981, Justice Shirley Fingerhood of the state court prohibited any picketing by Local 157 at Palm Beach's premises. Shortly thereafter, Local 157 removed the action to this Court by filing a petition for removal with the clerk of this Court. Palm Beach now moves, by order to show cause, for an order remanding this action to the state court on the ground that this Court lacks original subject matter jurisdiction over a case such as this. The parties have stipulated to extend the temporary restraining order granted by the state court until the date of this Court's decision of Palm Beach's remand motion. For the reasons hereinafter stated, Palm Beach's motion is denied.

## BACKGROUND

Palm Beach, through its Evan-Picone Division, engages in the design, manufacture, promotion, and sale of women's apparel. Palm Beach directly employs about 420 persons in this division, and maintains a manufacturing facility in North Bergen, New Jersey. Approximately one-third of the garments sold through this division are cut and sewn by Palm Beach employees; the remaining two-thirds are manufactured by independent contractors. Palm Beach merely acts as a jobber with respect to those garments manufactured by independent contractors, meaning that Palm Beach furnishes the contractor with the material and specifications necessary to make the garments, accepts delivery of the finished products from the contractors, and then sells the garments to retailers.

On June 1, 1979, Palm Beach and Local 133 of the International Ladies' Garment Workers' Union ("the ILGWU") entered into a three-year "Hazantown agreement,"[2] which provides that all garments handled by Palm Beach through the Evan-Picone Division will be manufactured either in Palm Beach's own shops or by independent contractors approved by the ILGWU. In June of this year, representatives of Local 157 commenced picketing at Palm Beach's North Bergen, New Jersey, place of business. Local 157 disclaimed any intention of seeking to organize Palm Beach's own employees. Instead, Local 157 demanded that Palm Beach enter into a Hazantown agreement with Local 157, which would require any Evan-Picone work subcontracted out by Palm Beach to be performed by contractors approved by Local 157.

Palm Beach refused to accede to Local 157's demand, and, shortly after the picket-

---

1. The complaint, which is hardly a model of particularity and specificity in pleading, does not state whether Palm Beach is relying on the tort law of the State of New York (where the conspiracy was allegedly formed) or that of the State of New Jersey (where the allegedly unlawful picketing occurred). The Court is not, at this stage, required to make any determination of this choice-of-law question. Where, later in this opinion, state law becomes relevant, the Court refers both to New York and New Jersey law.

2. "Hazantown agreements" are agreements between a jobber, such as Palm Beach, and a union, whereby the jobber agrees to "contract out" production only to shops approved or represented by the union. They are named after the jobber involved in the case of *Danielson v. Joint Board of Coat, Suit & Allied Garment Workers' Union*, 494 F.2d 1230 (2d Cir. 1974), in which the Court of Appeals for this Circuit held that union picketing to achieve such an agreement is not an unfair labor practice. *Jou-Jou Designs, Inc. v. ILGWU*, 643 F.2d 905, 906–07 (2d Cir. 1981).

ing began, commenced this action in the state court. The complaint alleges that Local 157's picketing arose, not because of Local 157's desire to secure a Hazantown agreement with Palm Beach, but actually because of a dispute between Local 157 and the ILGWU. Specifically, the complaint alleges, as developed in affidavits filed with the Court, that the ILGWU has been seeking a Hazantown agreement with Tahari, Ltd. ("Tahari"), a New York corporation also engaged in the apparel industry. Tahari currently has a Hazantown agreement with Local 157; Palm Beach contends that Local 157 is picketing its premises with the hope that Palm Beach will influence the ILGWU to discontinue its efforts to secure a Hazantown agreement with Tahari. The complaint further alleges that Tahari conspired with Local 157 in executing this plan, and thus names Tahari as a defendant along with Local 157 and two union officers. Palm Beach contends that Local 157's picketing, under these circumstances, constituted a tortious interference with Palm Beach's business relations, and hence violated state law.[3] As noted above, Justice Fingerhood of the state court signed a temporary restraining order that prohibited all picketing by Local 157 at Palm Beach's premises. Local 157 then filed the petition for removal that brought the case before this Court and set the stage for the motion that is the subject of today's decision.

## DISCUSSION

The right of the defendant in a state court civil action to remove the action to federal court is governed by 28 U.S.C. § 1441(a), which provides as follows:

Except as otherwise expressly provided by Act of Congress, any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending.

Palm Beach contends that the instant action is not one over which the federal district courts have original subject matter jurisdiction, and consequently moves for an order remanding this case to the state court. Defendants argue, to the contrary, that this action is one "arising under [an] Act of Congress regulating commerce" within the meaning of 28 U.S.C. § 1337, and thus is removable as an action "founded on a claim or right arising under the ... laws of the United States" within the meaning of 28 U.S.C. § 1441(b).[4] Specifically, Local 157 argues that the state law upon which Palm Beach relies has been preempted by federal labor law, and that as a result Palm Beach's action must be treated as "arising under" federal law because that is the only law providing a potential basis for Palm Beach's action. This argument raises two questions for the Court's decision: first,

3.  As noted earlier, the complaint does not specify whether Palm Beach is relying upon the law of the State of New York or that of the State of New Jersey. See note 1 *supra*. Palm Beach's complaint also mentions acts of violence or threatened violence allegedly committed by Local 157's pickets. *See* Complaint ¶ 13. If the complaint could be construed to allege a cause of action based on the violence that attends or threatens to attend Local 157's picketing, in addition to a cause of action based on the purported unlawfulness of Local 157's objective, the complaint would concededly state a non-preempted state law claim. The Court need not decide this issue, however, because, if the tortious interference claim is preempted, and hence removable under the principles discussed in text *infra*, then the violence claim would be removable along with the tortious interference claim, either pursuant to 28 U.S.C.

§ 1441(a) as a pendent state claim or pursuant to 28 U.S.C. § 1441(c) as a "separate and independent" state claim. *Billy Jack for Her, Inc. v. New York Coat, Suit, Dress, Rainwear and Allied Workers Local 1–35 (Billy Jack II)*, 515 F.Supp. 456, at 458 (S.D.N.Y.1981); *see UMW v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966).

4.  Technically, defendants base their removal petition not on the statutory language just quoted, but on the decision of this Court in *Billy Jack for Her, Inc. v. New York Coat, Suit, Dress, Rainwear and Allied Workers Local 1–35 (Billy Jack I)*, 511 F.Supp. 1180 (S.D.N.Y. 1981). However, since the petition in that case was based on these two statutory provisions, *see id.* at 1183, the Court reads the instant petition as having this statutory basis as well.

whether federal preemption provides a proper basis for the removal of an action to federal court; second, whether the state law relied upon by Palm Beach has been preempted in the context of the instant case.

■ The first of these questions may be dealt with fairly briefly. In *Billy Jack I, supra* note 4, 511 F.Supp. at 1184–88, the Court reviewed this very question at some length and concluded that federal preemption does indeed provide a proper basis for the removal of an action to federal court. Palm Beach has presented the Court with neither a new argument nor a subsequently decided or discovered case that persuades the Court to reconsider its previous determination of this issue.[5]

The Court accordingly turns to the second question, namely, whether the state law relied upon by Palm Beach has in fact been preempted, in the context of the instant case, by the federal labor laws. In *Billy Jack I, supra* note 4, the Court considered whether the New York law of tortious interference with contract had been preempted in circumstances similar to those presently before the Court. *See* 511 F.Supp. at 1189–92. However, since the preemption question now before the Court is somewhat different from that faced by the Court in *Billy Jack I*, and since Palm Beach has questioned whether the Court's decision in *Billy Jack I* was predicated on a proper understanding of the general principles governing federal labor law preemption, the Court deals with this question below in some detail. First, the Court reviews the general principles that govern adjudication of preemption questions in the federal labor context; next, the Court proceeds to apply those principles to the case at hand.

### A

In 1935, Congress enacted the National Labor Relations Act ("the NLRA"), Pub. L.No. 74–198, 49 Stat. 449 (1935), in order to correct the adverse effects on interstate commerce caused by labor-management disputes and to assure the right of employees to engage in a number of specified concerted activities. *See* 29 U.S.C. § 151. In enacting the NLRA, Congress clearly intended to create a uniform national labor policy to replace the host of inconsistent state laws regulating labor relations. *See* S.Rep.No. 573, 74th Cong., 1st Sess. 15 (1935). Congress subsequently, by its enactment in 1947 of the Labor Management Relations Act, Pub.L.No. 80–101, 61 Stat. 136 (1947), added section 8(b) to the NLRA,[6] which proscribed certain strikes, boycotts, and forms of picketing as unfair labor practices. It was soon recognized that the enactment of section 8(b) provided a method for labor unions to avoid the impact of certain state statutes and court decisions by arguing that the less restrictive prohibitions contained in section 8(b) were the exclusive means of employer redress.

Thus was inaugurated what seems to be a never-ending stream of litigation through the federal courts concerning the extent to

---

5. Among the "subsequently discovered" cases, the Court generally finds support for the position that it endorsed in *Billy Jack I. See, e. g., Eastern Plating, Inc. v. International Union, United Steelworkers,* 90 Lab.Cas. (Lab.L.Rep. (CCH)) ¶ 12,449, at 26,224 (S.D.Ohio Nov. 21, 1980); *Capital Parcel Delivery Co. v. Chauffeurs Local 150,* 105 L.R.R.M. (Lab.Rel.Rep. (BNA)) 3351, 3352 (E.D.Cal. Oct. 31, 1980).

6. The history of the development of § 8 of the NLRA, 29 U.S.C. § 158, is somewhat confusing. The 1935 enactment of the NLRA, more popularly known as the Wagner Act, marked the beginning of a significant federal labor policy in this country. Section 8 of the NLRA, as originally enacted, prohibited certain activities by employers as unfair labor practices. The Labor

Management Relations Act of 1947, also known as the Taft-Hartley Act, supplemented § 8 with §§ 8(b)(1)–(4), which designated certain union activities as unfair labor practices. In so doing, Congress tried to strike a balance between unions and employers, as the unfair labor practices designated by § 8 of the Wagner Act applied only to employers. Section 8(b)(4) was broadened in 1959 by the passage of the Landrum-Griffin Act, which made it an unfair labor practice for a labor organization to put pressure on "any person" for any purpose proscribed by § 8(b)(4). This act also added § 8(e), which prohibits a labor organization and an employer from entering into an agreement by which an employer agrees to refrain from handling the products of another employer.

which the NLRA preempts state laws that are potentially applicable in disputes arising out of various labor activities. The thirty-five years since the enactment of section 8(b) have witnessed a number of decisions by the Supreme Court that seek to instruct the lower courts on the principles to be applied to adjudicate any particular preemption question that might arise in the labor arena. Articulating such principles has proven to be a vexing task. In 1958, Justice Frankfurter remarked that, under the then-existing Supreme Court decisions, the problem of determining the parameters of the area left to the states after the NLRA required Delphic expertise. *International Association of Machinists v. Gonzales*, 356 U.S. 617, 619, 78 S.Ct. 923, 924, 2 L.Ed.2d 1018 (1958). Justice Harlan, writing for the Court some thirteen years later, commented that the previous opinions of the Court had created an "understandable confusion" concerning the jurisprudential bases of the labor preemption doctrine. *Amalgamated Association of Street, Electric Railway & Motor Coach Employees v. Lockridge*, 403 U.S. 274, 285, 91 S.Ct. 1909, 1917, 29 L.Ed.2d 473 (1971). The situation has not improved during the past decade, which culminated with the Court's consideration of *New York Telephone Co. v. New York State Department of Labor*, 440 U.S. 519, 99 S.Ct. 1328, 59 L.Ed.2d 553 (1979). There, none of the four opinions filed commanded the support of more than three of the Court's members. This led one commentator, upon recognizing the need "to clarify the principles that govern federal preemption in labor law," to observe that the Court's current approach to labor preemption questions shows a lack of interest in "logical consistency" or "in building a coherent and continuing body of law." Cox, *Recent Developments in Federal Labor Law Preemption*, 41 Ohio St.L.J. 277, 300 (1980).

Notwithstanding the foregoing, the Supreme Court precedents do provide substantial general guidance to the lower courts in deciding federal labor law preemption questions. Two tests for federal preemption in the labor area have emerged. The first was enunciated in *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959). There the Supreme Court held that "[w]hen it is clear or may fairly be assumed that the activities which a State purports to regulate are protected by § 7 of the National Labor Relations Act, or constitute an unfair labor practice under § 8, due regard for the federal enactment requires that state jurisdiction must yield." *Id.* at 244, 79 S.Ct. at 779. Later in the same opinion, the *Garmon* Court provided a similar formulation of the same test: "[w]hen an activity is arguably subject to § 7 or § 8 of the [NLRA], the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board if the danger of state interference with national policy is to be averted." *Id.* at 245, 79 S.Ct. at 780. The *Garmon* Court went on to state that a finding of preemption requires not just a determination that federal labor law provides an arguable basis for prohibiting or protecting the challenged activity, but also consideration of whether the case (1) touches "interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, we could not infer that Congress had deprived the States of the power to act," *id.* at 244, 79 S.Ct. at 779, or (2) involves conduct that is "a merely peripheral concern of the [federal labor laws]," *id.* at 243, 79 S.Ct. at 779. Several subsequent Supreme Court decisions have endeavored to flesh out this second prong of the *Garmon* test. In one recent formulation, the Court commented that "inflexible application of the [*Garmon*] doctrine is to be avoided, especially where the State has a substantial interest in regulation of the conduct at issue and the State's interest is one that does not threaten undue interference with the federal regulatory scheme." *Farmer v. Carpenters Local 25*, 430 U.S. 290, 302, 97 S.Ct. 1056, 1064, 51 L.Ed.2d 338 (1977).

The Supreme Court enunciated a second route to preemption, for cases where the conduct challenged under state law is *not* either arguably prohibited or arguably pro-

tected by federal labor law, with its decisions in *Local 20, Teamsters Union v. Morton*, 377 U.S. 252, 84 S.Ct. 1253, 12 L.Ed.2d 280 (1964) and *Lodge 76, International Association of Machinists v. Wisconsin Employment Relations Commission*, 427 U.S. 132, 96 S.Ct. 2548, 49 L.Ed.2d 396 (1976). In *Morton*, the Court found that the state law in question had been preempted even though the challenged activity was neither arguably protected by section 7 of the NLRA nor arguably prohibited by section 8 of the NLRA. 377 U.S. at 259–60, 84 S.Ct. at 1258–59. The Court's analysis started from the premise that Congress, in enacting the NLRA, intended to protect some conduct, to prohibit other conduct, and to leave a third category of conduct unregulated, and hence "available" as a tool to be used in the labor arena. *Id.* at 260, 84 S.Ct. at 1258. The Court reasoned that such "permitted" conduct, if Congress intended for it to be beyond federal regulation and hence controlled only by the free play of economic forces, must be beyond state regulation as well: otherwise the state law might be applied so as "to upset the balance of power between labor and management expressed in our national labor policy." *Id.* at 259–60, 84 S.Ct. at 1258–59.

*Machinists* added two important components to the analysis set forth in *Morton.*

First, the Court adopted the principle that the requisite congressional intent to leave conduct beyond state regulation would, in the absence of express congressional indication to the contrary, be inferred merely from the fact that Congress neither protected nor prohibited that conduct in the NLRA.[7] 427 U.S. at 148–51, 96 S.Ct. at 2557–58. Second, the Court endorsed the *Garmon* Court's qualification that the preemption doctrine should not be applied so as to "preclude the States from regulating aspects of labor relations that involve 'conduct touch[ing] interests so deeply rooted in local feeling and responsibility that ... we could not infer that Congress had deprived the States of the power to act,'" or to "withdraw 'from the States ... power to regulate where the activity regulated [is] a merely peripheral concern of the [federal labor laws].'" *Id.* at 136–37, 96 S.Ct. at 2551–52 (quoting *San Diego Building Trades Council v. Garmon, supra*, 359 U.S. at 244, 243, 79 S.Ct. at 779.[8]

■ In sum, there are two tests for preemption in the federal labor law context. The *Garmon* test has two components. First, the court must inquire whether the challenged conduct is either arguably protected or arguably prohibited by the federal

---

7. While *Machinists* did not expressly adopt this presumption in the form just stated, most commentators have read the case as necessarily resting on such a presumption. Comment, New York Telephone v. New York State Department of Labor: *Limiting the Doctrine of Implied Labor Law Pre-emption*, 46 Brooklyn L.Rev. 297, 305 & n.46 (1980); Note, *Federal Pre-emption of State Welfare and Unemployment Benefits for Strikers*, 12 Harv. C.R.–C.L. L.Rev. 441, 447 (1977); Note, *The Preemption Doctrine: New York Balks*, 29 Syracuse L.Rev. 739, 747 (1978). Any doubt on this point was resolved by the Supreme Court's decision in *New York Telephone Co. v. New York State Department of Labor, supra*, where five members of the Court expressly endorsed the use of such a presumption to find the requisite congressional intent. *See* 440 U.S. at 549, 99 S.Ct. at 1345 (Blackman, J., concurring), 556–60 (Powell, J., dissenting). *See generally* Cox, *supra*, 41 Ohio St. L.J. at 295.

8. In *Sears, Roebuck & Co. v. San Diego County District Council of Carpenters*, 436 U.S. 180, 98 S.Ct. 1745, 56 L.Ed.2d 209 (1978), the Supreme

Court hinted that it might retreat from its endorsement of the *Morton-Machinists* rule as an independent route to preemption when it characterized the *Garmon* rule as setting forth "*the* general guidelines for deciphering the unexpressed intent of Congress regarding the permissible scope of state regulation of activity touching upon labor-management relations." *Id.* at 187, 98 S.Ct. at 1752 (emphasis supplied). However, in *New York Telephone Co. v. New York State Department of Labor, supra*, the one point on which all nine justices agreed was that *Morton* and *Machinists* set forth a route to preemption for at least some cases where the challenged conduct is neither arguably protected nor arguably prohibited by the NLRA. The commentators have long recognized the existence of the alternative *Morton-Machinists* route to preemption. *See, e. g.*, Cox, *Labor Law Preemption Revisited*, 85 Harv.L.Rev. 1337, 1351–59 (1972); Lesnick, *Preemption Reconsidered: The Apparent Reaffirmation of Garmon*, 72 Colum.L.Rev. 469, 478–81 (1972).

labor laws. If it is, the state law is presumptively preempted, and the court must then proceed to inquire whether that presumption should be reversed either because the challenged conduct touches concerns deeply rooted in local feeling and responsibility, or because the proposed state regulation of that conduct would implicate the concerns underlying the federal labor laws only peripherally. The *Morton-Machinists* test, which covers all conduct not falling within *Garmon's* arguably protected-arguably prohibited formulation, also has two components. First, the court must determine whether Congress intended, by leaving the challenged conduct neither protected nor prohibited by the NLRA, to leave that conduct beyond all governmental regulation, state or federal. If such an intent is inferred, the state law is presumptively preempted, at which point the court must proceed to inquire, in the same fashion as it would under the *Garmon* test, whether that presumption should be reversed either because the case touches particularly significant state concerns or because federal concerns are implicated only tangentially by the proposed state regulation of the challenged conduct.

### B

Having stated what it views to be the general principles governing its preemption analysis, the Court proceeds to apply those principles to the case at hand. Theoretically, the Court must first decide whether this case is governed by the test enunciated in *Garmon*, or instead is controlled by the principles set forth in *Morton* and *Machinists*. As a practical matter, however, the Court need not make this decision, because the two tests, in cases such as this, reduce to a single method for resolving preemption questions.

As noted above, each test has two prongs, and the two tests share the same second prong. The first prong of each test is designed to provide a basis for inferring, in the absence of express congressional direction, that Congress intended to preempt the state law in question when it enacted the NLRA. Formally, the two tests have different first prongs: the *Garmon* test draws the requisite inference from the fact that Congress arguably regulated the challenged conduct in the NLRA, whereas the *Morton-Machinists* test rests its inference of congressional intent on the fact that the NLRA leaves the challenged conduct unregulated. However, the result of this difference is that, in any case where Congress has failed to give an express indication of its preemptive intent, and this is one such case,[9] the first prong of either the *Garmon* test or the *Morton-Machinists* test is certain to be satisfied no matter what the challenged conduct is. To explain: if the challenged conduct is either arguably protected or arguably prohibited, bringing it within the *Garmon* test, it will satisfy *Garmon's* first prong precisely because of its arguably protected or arguably prohibited character; however, if the challenged conduct is neither arguably protected nor arguably prohibited, meaning that it falls under the *Morton-Machinists* test because it is "permitted," it will satisfy the first prong of that test because a congressional intent to preempt state law will be inferred from the fact that Congress left the conduct unregulated.

Thus, since the conduct at issue here satisfies the first prong of *one* of the two tests, and since the two tests have identical second prongs, the Court need not decide which test ought to be applied, and thus is not required to determine whether the conduct alleged in Palm Beach's complaint is either arguably protected or arguably prohibited by the NLRA.[10] Viewed together,

9. Palm Beach has not suggested that there is any express indication, either in the legislative history of the NLRA or in subsequently enacted legislation, of a congressional intent that the states should be left free to regulate conduct such as allegedly occurred here. The Court has found nothing along these lines. Thus, this is a

case where the congressional intent, one way or another, must be inferred from the circumstances at hand.

10. The arguably protected-arguably prohibited formulation set forth in *Garmon* has been criticized on several grounds. First, given that the

the two tests set forth above stand for a single method, embodied in their identical second prongs, of adjudicating federal labor preemption cases such as this. In other words, *Garmon, Morton,* and *Machinists* stand for the proposition that the decision whether the state law at issue has been preempted in the present context depends not on whether Local 157's alleged conduct

is arguably either protected or prohibited by the NLRA, but rather on the extent to which that conduct implicates concerns that are deeply rooted in local feeling and responsibility, and the extent to which the proposed state regulation of that conduct would touch concerns that are at the heart of, rather than merely peripheral to, the federal labor laws.[11] The task for the

Supreme Court has found preemption in a case where the challenged conduct was *neither* arguably prohibited nor arguably protected by the NLRA, *see Lodge 76, International Association of Machinists v. Wisconsin Employment Relations Commission, supra,* and refused to find preemption in a case where the challenged conduct was *both* arguably protected and arguably prohibited by the NLRA, *see Sears, Roebuck & Co. v. San Diego County District Council of Carpenters, supra* note 8, it is apparent, once one accepts the existence of the *Morton-Machinists* route to preemption, that the arguably protected-arguably prohibited inquiry advances a court's analysis only rarely and inevitably tends to distract the court from focusing directly on the degree to which competing state and federal interests are implicated by the case at hand. *See* Cox, *supra,* 41 Ohio St.L.J. at 291. Second, the necessity of focusing on whether the challenged conduct is arguably prohibited by the NLRA often leads to an absurd spectacle, which the Court confronted in this very case, wherein a defendant union is charged with violation of state law and defends on the ground that it has violated federal law as well, while a plaintiff employer asserts the complete propriety of the union's conduct under federal standards. *See* Lesnick, *supra* note 8, 72 Colum.L.Rev. at 469. For reasons such as these, more than one commentator has recommended that *Garmon's* arguably protected-arguably prohibited inquiry be discarded entirely in favor of an approach that focuses directly on balancing the state interest in regulating the challenged conduct against the federal interest in resisting the proposed application of state law. *See, e. g.,* Cox, *supra* note 8, 85 Harv.L. Rev. at 1351–68; Recent Development, 64 Cornell L.Rev. 595, 609–12 (1979).

**11.** While the Court need not inquire whether the conduct alleged here is arguably protected or arguably prohibited by the NLRA, it notes that there is little doubt that this conduct falls within the traditional *Garmon* formulation. As one commentator has observed, very few labor activities are not either arguably protected or arguably prohibited by the NLRA. Cox, *supra* note 8, 85 Harv.L.Rev. at 1350. The Court does not regard the conduct alleged here to be within the narrow band of concerted labor activities that are *clearly* neither protected nor prohibited by the NLRA. Instead, the Court regards

Local 157's challenged conduct to be arguably prohibited under § 8(b)(4)(B) of the NLRA, 29 U.S.C. § 158(b)(4)(B) ("§ 8(b)(4)(B)") and § 8(b)(4)(D) of the NLRA, 29 U.S.C. § 158(b)(4)(D) ("§ 8(b)(4)(D)"). At the same time, the conduct is arguably protected under § 8(b)(4)(B) by virtue of the "garment industry proviso" set forth in § 8(e) of the NLRA, 29 U.S.C. § 158(e) ("§ 8(e)"), which is applicable by its terms to § 8(b)(4)(B).

Section 8(b)(4)(B) was enacted primarily to prohibit "secondary activity" by a labor organization, that is, activity by a union that forces or attempts to force an employer with whom it has no labor dispute (the "secondary" or "neutral" employer) to discontinue or curtail its business dealings with an employer with whom the union does have a labor dispute (the "primary" employer). Section 8(b)(4)(B) does not, however, employ the terms "secondary," "neutral," or "primary" employer. As the Court of Appeals for this Circuit stated in *National Maritime Union v. NLRB,* 342 F.2d 538, 542 (2d Cir.), *cert. denied,* 382 U.S. 835, 86 S.Ct. 78, 15 L.Ed.2d 78 (1965), the application of § 8(b)(4)(B) was not intended to be limited to cases falling within the usual definition of secondary activity. It may be argued, therefore, that certain union conduct, while it does not fall squarely within a strict definition of secondary activity, is sufficiently analogous to such activity to be encompassed within the prohibitions of § 8(b)(4)(B). *See Local 761, International Union of Electrical, Radio & Machine Workers v. NLRB,* 366 U.S. 667, 672–73, 81 S.Ct. 1285, 1288–89, 6 L.Ed.2d 592 (1961). Such an approach fully accords with the limited congressional purpose, in enacting § 8(b)(4)(B), that peaceful picketing should be proscribed only where necessary to protect a neutral employer caught through no fault of its own in the cross-fire of two other parties' labor dispute. Thus, it can be argued that Congress, since it did not intend to confine the application of § 8(b)(4)(B) to cases falling within a strict definition of the term "secondary activity," also did not intend to require the existence of a "primary" employer as a prerequisite to the applicability of § 8(b)(4)(B). *National Maritime Union v. NLRB, supra,* 342 F.2d at 542–43. As the Supreme Court declared in *NLRB v. Denver Building & Construction Trades Council,* 341 U.S. 675, 692, 71 S.Ct. 943, 953, 95

Court is thus to weigh the state's interest in applying its law of tortious interference with business relations against the federal interest in resisting application of that law, and to make its preemption decision according to the outcome of that balancing process. *See Farmer v. Carpenters Local 25, supra*, 430 U.S. at 300–01, 97 S.Ct. at 1063–64.

The paradigmatic example of a case wherein the challenged conduct touches concerns deeply rooted in local feeling and responsibility is an action to enjoin or to recover compensation for violent or threatened violent picketing. Even prior to *Garmon* the Supreme Court had recognized that state law could properly be applied to such conduct. *See, e. g., UAW v. Russell*, 356 U.S. 634, 646, 78 S.Ct. 932, 939, 2 L.Ed.2d 1030 (1958); *United Construction Workers*

*v. Laburnum Construction Corp.*, 347 U.S. 656, 669, 74 S.Ct. 833, 840, 98 L.Ed. 1025 (1954). The *Garmon* Court specifically held that the states were permitted to enjoin or to award compensation for the consequences of "conduct marked by violence and imminent threats to the public order." *San Diego Building Trades Council v. Garmon, supra*, 359 U.S. at 247, 79 S.Ct. at 781. More recently, the Supreme Court commented that "[p]olicing of actual or threatened violence to persons or destruction of property has been held most clearly a matter for the States." *Lodge 76, International Association of Machinists v. Wisconsin Employment Relations Commission, supra*, 427 U.S. at 136, 96 S.Ct. at 2551. The lower courts have consistently adhered to this principle. *See, e. g., Billy Jack II, supra*, note 3, at 1183.

L.Ed. 1284 (1951), the congressional purpose behind § 8(b)(4)(B) was to shield unoffending employers and others from controversies not of their own making. *See also Carpet, Linoleum, Soft Tile and Resilient Floor Covering Layers Local 419 v. NLRB*, 429 F.2d 747, 750 (D.C.Cir. 1970); *National Maritime Union v. NLRB*, 346 F.2d 411, 416–17 (D.C.Cir.), *cert. denied*, 382 U.S. 840, 86 S.Ct. 90, 15 L.Ed.2d 82 (1965). In view of the clear congressional purpose to confine labor disputes to the parties interested therein, it makes no logical difference whether the picketing union puts damaging economic pressure on a neutral employer with the intent of increasing economic pressure on a primary employer, or is, instead, using such economic pressure against a neutral employer to achieve its objective of prevailing over a rival union, as is alleged in the complaint filed in this action. Therefore, the activity alleged here could arguably fall within the prohibitions of § 8(b)(4)(B). *See National Maritime Union v. NLRB, supra*, 342 F.2d at 541–43. *See also Walsh v. ILA*, 488 F.Supp. 524, 529–30 (D.Mass.1980).

Inasmuch as the parties herein are involved in the garment industry, the so-called "garment industry proviso" contained in § 8(e) becomes relevant. That proviso, which by its terms is applicable to § 8(b)(4)(B), exempts from prohibition picketing directed at "persons in the relation of a jobber, manufacturer, contractor, or subcontractor working on the goods or premises of the jobber or manufacturer or performing parts of an integrated process of production in the apparel and clothing industry." 29 U.S.C. § 158(e). Therefore, even if plaintiff Palm Beach is indeed a neutral employer (that is, one indirectly involved in a labor dispute), the picketing is still arguably protected by the NLRA under the garment industry proviso. *See Dan-*

*ielson v. Joint Board of Coat, Suit & Allied Garment Workers' Union, supra* note 2.

Section 8(b)(4)(D) provides yet another basis for an arguable prohibition of Local 157's alleged conduct. That section prohibits a labor organization from placing pressure on any person engaged in commerce, where the union's object is to force such person to assign particular work to its members rather than to the members of another labor organization. The complaint alleges in essence that the assignment of work by plaintiff Palm Beach is not in issue, but rather that the object of Local 157's picketing is to coerce plaintiff Palm Beach to bring pressure to bear upon the ILGWU in connection with a dispute between Local 157 and the ILGWU concerning work contracted out by another apparel corporation, Tahari. Although the typical § 8(b)(4)(D) violation involves pressure placed on the employer who has the power to assign the work in question, the statute itself is not by its terms limited to proscribing pressure directed at such an employer; rather, it proscribes this type of pressure when addressed toward "any person engaged in commerce." Moreover, the purpose behind § 8(b)(4)(D) is to protect persons from being enmeshed in disputes of which they are not the cause. As a result, since it is evident from the complaint that (1) Palm Beach is a "person engaged in commerce" within the meaning of § 8(b)(4)(D), (2) Palm Beach is not a party to the alleged labor dispute between Local 157 and the ILGWU, and (3) the issue in the alleged labor dispute concerns the assignment of work, the Court is of the view that Local 157's alleged conduct is arguably prohibited by § 8(b)(4)(D). *See Longshoremen's Local 911*, 236 N.L.R.B. 1440, 1440 (1978).

Subsequent to *Garmon*, the Supreme Court found the requisite local interest with respect to other torts that posed an imminent threat to public order, *see, e. g., Sears, Roebuck & Co. v. San Diego District Council of Carpenters, supra*, note 8, 436 U.S. at 190–98, 98 S.Ct. at 1754–58 (trespass), and also with respect to certain personal torts, *see, e. g., Farmer v. Carpenters Local 25, supra*, 430 U.S. at 304–05, 97 S.Ct. at 1065–66 (intentional infliction of emotional distress); *Linn v. Plant Guard Workers Local 114*, 383 U.S. 53, 63, 86 S.Ct. 657, 663, 15 L.Ed.2d 582 (1966) (libel). The inclusion of personal torts in this category is based on the notion that the state's special interest in protecting the health and safety of its citizens extends not only to protecting them from physical injury but also from the infliction of mental or psychological harm. *Farmer v. Carpenters Local 25, supra*, 430 U.S. at 302–03, 97 S.Ct. at 1064–65. As a general matter, this Court believes that the state interest raised by a personal tort such as has been held to survive federal preemption is far more significant than that implicated by a business tort such as allegedly occurred here; the difference is that the alleged tortious conduct of which Palm Beach complains in this case has not inflicted and does not threaten to inflict any direct physical or mental harm on a citizen of the state in question, but only an economic injury. *See Hennepin Broadcasting Associates, Inc. v. NLRB*, 408 F.Supp. 932, 937 (D.Minn.1975). There may be particular cases where such an economic injury, because of its widespread impact on the community as a whole, raises a sufficient state interest to make a case for holding that the state tort law survives preemption. *Cf. Wien v. Chelsea Theater Center*, 91 Misc.2d 226, 230, 397 N.Y.S.2d 865, 868 (Sup. Ct.N.Y.Co.1977) (trial court found no preemption because of potentially broad impact of challenged conduct on the theatre, "an industry of great economic and artistic significance to [New York] city and [New York] state"), *rev'd*, 66 A.D.2d 741, 411 N.Y. S.2d 316 (1st Dep't 1978) (appellate court reversed, but without rejecting general proposition that certain economic injuries could raise sufficient state interests to avoid preemption). However, the Court does not find that the conduct challenged in this case even remotely threatens to have such a community-wide economic impact, and thus declines to depart here from the general rule that business torts do not raise significant enough state concerns for the state tort law to survive preemption. This is not to say that the state has no interest whatsoever in regulating conduct such as allegedly occurred here, but merely to conclude that such conduct does not fall within the narrow category of conduct that so implicates concerns deeply rooted in local feeling and responsibility that the Court is incapable of concluding that Congress intended to deprive the states of jurisdiction to regulate that conduct.

The Court's preemption analysis is not entirely controlled by the fact that the conduct at issue here does not implicate the deeply rooted state concerns that have been identified in other cases where no preemption has been found. The state does have an interest in regulating conduct such as allegedly occurred here; while the interest is of relatively low priority as state interests go, it is undeniably legitimate. The Court thus must consider the federal interest in resisting the proposed state regulation of Local 157's challenged conduct, and decided the preemption question by balancing the state and federal interests against one another.

■ Some courts have, quite properly in this Court's view, begun their analysis of the federal interest in resisting the proposed application of the state law in question by inquiring whether the facts of the case at hand disclose a "labor dispute" within the meaning of the federal labor laws. *See, e. g., Barclay's Ice Cream Co. v. Local 757, Ice Cream Drivers and Employees Union*, 51 A.D.2d 516, 517, 378 N.Y.S.2d 395, 397–98 (1st Dep't 1976), *aff'd*, 41 N.Y.2d 269, 360 N.E.2d 956, 392 N.Y.S.2d 278 (1977). Certainly, if the case does not even involve a federal labor dispute, it is difficult to argue that application of state law to the conduct at issue would somehow raise a

serious federal concern by upsetting the balance of power between labor and management struck by the federal labor laws. Unfortunately for Palm Beach, there can be no doubt that this case involves a labor dispute as that term is defined in the federal labor laws.[12] The complaint alleges that there is an ongoing rivalry between Local 157 and the ILGWU, and challenges conduct that concededly was undertaken in the context of that inter-union rivalry with the goal of achieving a bona fide labor objective. The controversy plainly concerns "the association or representation of persons in negotiating . . . terms or conditions of employment." See 29 U.S.C. § 152(9). As such, the Court does not see how it can be characterized as anything other than a federal labor dispute, notwithstanding the fact that Palm Beach is not a party to the dispute. Palm Beach's status as an "innocent bystander" may be sufficient to give it a right to legal relief, but it is insufficient to support a conclusion that this case does not involve a federal labor dispute. See National Maritime Union v. NLRB, supra, note 11, 342 F.2d at 541.

Other courts have on occasion refused to find preemption, even where, as here, the facts as alleged do disclose a federal labor dispute, on the theory that the proposed application of the state law in question would touch the concerns embodied in the federal labor laws in a merely peripheral fashion. See, e. g., Mobile Mechanical Contractors Association v. Carlough, 456 F.Supp. 310, 333 (S.D.Ala.1978). Typically, the courts have found such a peripheral involvement of federal labor concerns where application of the state law in question would not declare the defendant's labor objective unlawful, but instead either would only regulate the means of obtaining that objective or would invalidate a different, non-labor-oriented objective. See Sears, Roebuck & Co. v. San Diego County District Council of Carpenters, supra note 8, 436

U.S. at 198, 98 S.Ct. at 1758 (application of state trespass law would regulate location of picketing, not union's labor objective); Farmer v. Carpenters Local 25, supra, 430 U.S. at 304, 97 S.Ct. at 1065 (application of state law would declare statements unlawful only insofar as they were made with intent of causing emotional distress, and would not reach validity of defendant's unrelated labor-oriented objective); Linn v. Plant Guard Workers Local 114, supra, 383 U.S. at 63, 86 S.Ct. at 663 (application of state libel law would render statements unlawful only insofar as they were made with defamatory intent, and would not reach validity of defendants' unrelated labor-oriented objective); UAW v. Russell, supra, 356 U.S. at 645, 78 S.Ct. at 939 (application of state law would declare picketing unlawful insofar as it was conducted violently, without reaching union's labor objective).

The rationale for focusing on whether the proposed application of the state law in question would challenge the defendant's labor objective is fairly easily explained. Federal labor law, as noted, protects some conduct, prohibits other conduct, and leaves still other conduct neither protected nor prohibited. It thereby establishes a particular balance between the various groups engaged in the labor arena. See Cox, supra, 41 Ohio St.L.J. at 295. The category into which any particular conduct falls inevitably depends upon the objective of that conduct. Where, as here, the defendant's objective is such that its conduct may well be either protected or permitted by the federal labor laws, application of state law to condemn the defendant's objective and hence to prohibit its conduct would threaten to cause a different balance to be struck in the labor arena than that established by the federal statutory scheme. However, if the proposed application would not challenge the defendant's labor objective, but would only regulate the manner in which it sought to attain that objective, it is plain enough

---

12. The term "labor dispute" includes any controversy concerning terms, tenure or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether the disputants stand in the proximate relation of employer and employee. 29 U.S.C. § 152(9).

that there need be far less concern that state law might be applied so as to disturb significantly the balance struck by Congress.

The complaint filed in the instant action alleges that the objective of Local 157's picketing is to coerce Palm Beach to put pressure on the ILGWU, in order that Local 157 might gain an advantage over the ILGWU in their ongoing rivalry. However, this goal of exerting coercive economic pressure on Palm Beach is precisely the objective that would form the predicate for a holding that Local 157's conduct constituted a tortious interference with Palm Beach's business relations; that is, the state court would only find Local 157's interference "tortious" if it concluded that Local 157's objective or motive was wrongful. See Fox v. Congel, 75 A.D.2d 681, 682, 426 N.Y.S.2d 878, 880–81 (3d Dep't 1980); Levin v. Kuhn Loeb & Co., 174 N.J.Super. 560, 573, 417 A.2d 79, 86 (App.Div.1980). In other words, Palm Beach's state law claim challenges the lawfulness of Local 157's labor objective. Since Local 157's objective may be permitted, or even protected, under the federal labor laws, see note 11 supra, it follows that the proposed application of state law to prohibit Local 157's objective seriously threatens to alter, in precisely the fashion that the preemption doctrine seeks to avoid, the balance struck by Congress in enacting the federal labor laws. As a result, the Court concludes that the concerns that would be touched by the application of state law in the manner sought by Palm Beach are not merely peripheral to, but rather lie at the heart of, the federal labor laws. Thus, in this case there is a substantial federal interest in resisting the proposed application of state law.

In sum, the Court is faced with the following situation. The allegedly tortious conduct at issue here does not touch concerns deeply rooted in local feeling and responsibility, meaning that the state's interest in applying its law, while not insignificant, is not paramount. At the same time, the proposed application of the state law in question would touch concerns that lie at the heart of, and are not merely

peripheral to, the federal labor laws, meaning that the federal interest in resisting the proposed application of state law is substantial. Under these circumstances, the Court is constrained to strike the balance in favor of the federal interests and to hold that the state law relied upon by Palm Beach has been preempted. This holding is in accord with what the Court regards to be substantial judicial precedent supporting a general rule that state business tort law is preempted where such law is invoked to challenge the objective of the defendant's labor activity. See California State Council of Carpenters v. Associated General Contractors, Inc., 648 F.2d 527, 540 (9th Cir. 1980); Billy Jack I, supra note 4, 511 F.Supp. at 1189–92; Eastern Plating, Inc. v. International Union, United Steelworkers, supra note 5, 90 Lab.Cas. at 26,225; Capital Parcel Delivery Co. v. Chauffeurs Local 150, supra note 5, 105 L.R.R.M. at 3352–53; Wilkes-Barre Publishing Co. v. Newspaper Guild Local 120, 504 F.Supp. 54, 64–69 (M.D.Pa.1980); Hennepin Broadcasting Associates, Inc. v. NLRB, supra, 408 F.Supp. at 937; California State Council of Carpenters v. Associated General Contractors, Inc., 404 F.Supp. 1067, 1072 (N.D.Cal.1975), aff'd in part, rev'd on other grounds in part, 648 F.2d 527 (9th Cir. 1980). Cf. New York Telephone Co. v. New York Labor Department, supra, 440 U.S. at 560, 99 S.Ct. at 1351 (Powell, J., dissenting) (local feeling and responsibility exception to preemption extends only to "state laws protecting against personal torts or violence to property"); Sears, Roebuck & Co. v. San Diego County District Council of Carpenters, supra note 8, 436 U.S. at 194–95 n.24, 98 S.Ct. at 1756 n.24 (dictum) ("result [of federal preemption] would undoubtedly obtain were an employer subjected to recognitional or secondary picketing to seek injunctive relief in state court on the theory that the union was tortiously interfering with his freedom to contract"); Connell Construction Co. v. Plumbers Local 100, 421 U.S. 616, 635–37, 95 S.Ct. 1830, 1841–42, 44 L.Ed.2d 418 (1975) (holding that state antitrust laws are preempted by federal labor laws when in-

voked in the context of a labor dispute, on the ground that "[p]ermitting state antitrust law to operate in this field could frustrate the basic federal policies favoring employee organization and allowing elimination of competition among wage earners").

## CONCLUSION

On the basis of the foregoing, the Court holds that this action was properly removed from the state court to this Court because the state law upon which Palm Beach's complaint relies has been preempted by federal labor law. Thus, Palm Beach's right to relief, if any exists, depends entirely on federal law and must be deemed to arise under federal law. Accordingly, Palm Beach's motion for a remand of this action to the state court is denied. Discovery is to be completed by September 30, 1981, and a pre-trial order filed by October 30, 1981.

It is so ordered.