Albert H. SHERMAN, Plaintiff,

v.

ST. BARNABAS HOSPITAL, a not-for-profit corporation of the State of New York; Dale D. Embich; District 1199, National Union of Hospital and Health Care Employees, RWDSU, AFL-CIO; Leon Davis; Doris Turner; Ramon Malave; Patrick Battel; Bernice Karolkowski and Tony Selka, Defendants.

No. 81 Civ. 4704 (GLG).

United States District Court,
S. D. New York.

March 29, 1982.

Lanigan, O'Connell, Jacobs & Chazin, New York City, for plaintiff (Andrew R. Jacobs, New York City, of counsel).

Emmet, Marvin & Martin, New York City, for defendants St. Barnabas Hospital and Dale D. Embich (Dennis C. Fleischmann, New York City, of counsel).

Sipser, Weinstock, Harper, Dorn & Leibowitz, New York City, for Union defendants (Jerome Tauber, New York City, of counsel).

## OPINION

GOETTEL, District Judge:

St. Barnabas Hospital ("Hospital") is a voluntary, nonprofit hospital located in the South Bronx. The Hospital employs 1100 workers, approximately 800 of whom are members of the National Union of Hospital and Health Care Employees, RWDSU, AFL–CIO District 1199 ("Union"). In 1968, the Hospital hired the plaintiff, Albert H. Sherman, to head its food services department. There was no written contract between the plaintiff and the Hospital, nor was his employment for a definite term. The plaintiff served as director of food services from 1968 to 1980 and in that capacity was directly responsible for the selection, training, promotion, salary increases, and termination of the 175 employees in his department, all of whom were members of the Union. (The plaintiff was not a member of the Union.)

In the early spring of 1980, the Hospital began to receive complaints about the plaintiff and demands from the Union that he be discharged. (The reason for these complaints is in dispute. For the purposes of deciding the present motions, we must accept as true the plaintiff's allegations, *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974), that the Union's complaints stem from the plaintiff's refusal to agree to the Union's preferential hiring and scheduling demands.) The Hospital attempted to resolve the situation through numerous meetings with the plaintiff and the Union during the spring and summer of 1980, but these meetings were not fruitful. The Union persisted in its demand that the plaintiff be fired and threatened an industry-wide work stoppage if this demand was not met. Fearful of a strike, the Hospital capitulated and placed the plaintiff on involuntary early retirement. (The plaintiff was 60 years old at the time.)

The Hospital concedes that union pressure was the only reason for the plaintiff's discharge, although it challenges plaintiff's allegations as to why the Union wanted him fired. There is no allegation that the plaintiff was incompetent. Indeed, the Hospital provided the plaintiff with excellent references when he was seeking new employment after his discharge from the Hospital.[1]

The plaintiff has filed this action against the Hospital and the Union to recover damages for lost wages and pension benefits and for mental suffering and humiliation. He sets forth a variety of causes of action: abusive discharge (Counts One and Two), breach of contract (Count Three) (Hospital only), *prima facie* tort (Count Four), tortious interference with contractual relations (Count Five) (Union only), tortious interference with an advantageous economic relationship (Count Six) (Union only), conspiracy to violate the plaintiff's constitutional rights, 42 U.S.C. § 1985(c) (1976) (Count Seven), and a violation of the Age Discrimi-

---

1. He obtained a comparable job in New Jersey at an annual salary of approximately $8,000 less than what he was earning at St. Barnabas. The plaintiff's new supervisor indicates that the

plaintiff was hired in large part because of the excellent reference he received from St. Barnabas. Affidavit of Albert Sherman ¶ 9.

nation Employment Act of 1967, 29 U.S.C. § 630(b) (Supp. III 1979) (Count Eight) (Hospital only).

The Hospital moves to dismiss Counts One through Four as well as Count Seven pursuant to Fed.R.Civ.P. 12(b)(6) and moves for summary judgment on Count Eight pursuant to Fed.R.Civ.P. 56. The Union moves to dismiss all of the counts against it pursuant to Fed.R.Civ.P. 12(b)(1) and (6) on the grounds that the action is preempted and falls within the exclusive jurisdiction of the National Labor Relations Board and that it is time barred by the six-month statute of limitations in section 10(b) of the National Labor Relations Act, 29 U.S.C. § 160(b) (1976).

For the reasons stated below, the motions to dismiss the abusive discharge counts (Counts One and Two), the breach of contract count (Count Three), and the tortious interference with contractual relations and an advantageous economic relationship counts (Counts Five and Six) are denied. The motion to dismiss Counts Four, Seven and Eight are granted.

### I. Hospital's Motion to Dismiss

### A. *Counts One and Two: Abusive Discharge*

The black letter law of employment at will contracts traditionally has been that an employer may discharge the employee "for good cause, for no cause, or even for cause morally wrong, without thereby being guilty of a legal wrong." *Payne v. Western & A. R. R.*, 81 Tenn. 507, 519–20 (1884), *overruled on other grounds, Hutton v. Watters*, 132 Tenn. 527, 179 S.W. 134 (1915); *see* Blades, *Employment at Will vs. Individual Freedom: On Limiting the Abusive Exercise of Employer Power*, 67 Colum.L.Rev. 1404, 1405 (1967); Note, *Implied Contract Rights to Job Security*, 26 Stan.L.Rev. 335 (1974). So basic was this rule that one annotator could correctly write only a few years ago that "few legal principles would seem to be better settled than the broad generality that an employment for an indefinite term is regarded as an employment at will which may be terminated at any time by either party for any reason or for no reason at all." Annot., Employee's Arbitrary Dismissal as Breach of Employment Contract Terminable at Will, 62 A.L.R.3d 271, 271 (1975).[2]

Although employers still retain relatively complete freedom to discharge employees at will, they can no longer discharge them for *any* reason whatsoever. Harsh applications and abuse of the rule have prompted statutory and judicial modifications aimed at

---

**2.** The employment at will rule is of American, not English, derivation. Under the common law, a contract for indefinite employment was presumed to extend for one year. The American rule is traced to an 1877 treatise on master-servant relationships:

> With us the rule is inflexible that a general or indefinite hiring is *prima facie* a hiring at will, and if the servant seeks to make it out a yearly hiring, the burden is upon him to establish it by proof. A hiring at so much a day, week, month, or year no time being specified, is an indefinite hiring, and no presumption attaches that it was for a day even, but only at the rate fixed for whatever time the party may serve.

Note, *Implied Contract Rights to Job Security*, 26 Stan.L.Rev. 335, 341 (quoting H. Wood, Master and Servant § 134 (1877)).

It is generally agreed that Wood's analysis is erroneous and not supported by the cited authority. Knight, *Contracts, Annual Survey of S.C. Law*, 32 S.C.L.Rev. 54, 60–61 (1980). See Peck, *Unjust Discharges From Employment: A Necessary Change in the Law*, 40 Ohio St.L.J.

1, 2 (1979); Summers, *Individual Protection Against Unjust Dismissal: Time for a Statute*, 62 Va.L.Rev. 481, 485 (1976); Note, *Implied Contract Rights to Job Security, supra*, 26 Stan. L.Rev. at 341. Nevertheless, the rule quickly took root and even temporarily attained constitutional magnitude. *Pierce v. Ortho Pharmaceutical Corp.*, 84 N.J. 58, 417 A.2d 505, 509 (1980); *see Coppage v. Kansas*, 236 U.S. 1, 13–14, 35 S.Ct. 240, 243, 59 L.Ed. 441 (1915); *Adair v. United States*, 208 U.S. 161, 174–75, 28 S.Ct. 277, 280–281, 52 L.Ed. 436 (1908). *See generally* Note, *Protecting At Will Employees Against Wrongful Discharge: The Duty to Terminate Only in Good Faith*, 93 Harv.L.Rev. 1816, 1824–28 (1980); Note, *Implied Contract Rights to Job Security, supra*, 26 Stan.L.Rev. at 340–47.

The rule is apparently unique to the United States. Other industrialized countries generally have a "good cause" or "just cause" requirement for all discharges. *See* Summers, *supra*, 62 Va.L.Rev. at 508–19; Note, *Protecting At Will Employees Against Wrongful Discharge, supra*, 93 Harv.L.Rev. at 1835–36.

preventing discharges that are contrary to public policy.

The statutory modification of the rule can be found in laws prohibiting discrimination and retaliation. Title VII of the Civil Rights Act of 1964, for example, makes it unlawful for an employer to discharge an employee because of race, color, religion, sex, or national origin, 42 U.S.C. § 2000e–2 (1976), or to discharge any employee in retaliation for filing charges under Title VII. 42 U.S.C. § 2000e–3 (1976). Similarly, the National Labor Relations Act prevents an employer from discharging an employee for forming or joining a union or in retaliation for filing charges against the employer. 29 U.S.C. § 158 (1976). Many states and municipalities have enacted similar statutes. *See* 8A Lab.Rel.Rep. (BNA) 451: 101–05 (April 1978); Peck, *Unjust Discharges From Employment: A Necessary Change in the Law,* 40 Ohio St.L.J. 1, 14 (1979).

The courts have modified the rule through a number of legal theories. By implying a requirement that parties to an employment relationship deal in good faith, some courts have imposed contract liability on employers found to have acted in bad faith.[3] *See Fortune v. National Cash Register Co.,* 373 Mass. 96, 104, 364 N.E.2d 1251, 1256 (1977) (employment at will contracts, like all contracts, contain an implied covenant of good faith); *Monge v. Beebe Rubber Co.,* 114 N.H. 130, 316 A.2d 549, 551 (1974) (termination motivated by bad faith is not in the best interest of society and constitutes a breach of contract). *See also McKinney v. National Dairy Council,* 491 F.Supp. 1108 (D.Mass.1980); *McNulty v. Borden,* 474 F.Supp. 1111, 1119 (E.D.Pa. 1979). Another theory of liability holds em-

ployers liable for intentional infliction of emotional distress when the discharge has been extreme and outrageous. *See Agis v. Howard Johnson Co.,* 371 Mass. 140, 355 N.E.2d 315 (1976) (restaurant manager held liable for firing waitresses in alphabetical order to force them to disclose who had been stealing from the restaurant). *See also Contreras v. Crown Zellerbach Corp.,* 88 Wash.2d 735, 565 P.2d 1173 (1977); *Alcorn v. Anbro Engineering, Inc.,* 2 Cal.3d 493, 468 P.2d 216, 86 Cal.Rptr. 88 (1970); *but see M. B. M. Co. v. Counce,* 596 S.W.2d 681 (Ark.1980) (no cause of action for intentional infliction of mental distress because plaintiff was an employee at will).[4] *See generally,* Annot., 86 A.L.R.3d 454 (1978 & Supp. 1981). Most courts have modified the rule under a "public policy" exception to the employment at will rule. This exception allows the discharged employee to recover where the discharge violates some important public policy. *See, e.g., Petermann v. Teamsters Local 396,* 174 Cal. App.2d 184, 344 P.2d 25 (1959) (employee discharged for refusing to commit perjury entitled to recover under breach of contract); *Smith v. Atlas Off-Shore Boat Service, Inc.,* 653 F.2d 1057 (5th Cir. 1981) (seaman discharged for filing Jones Act claim permitted action under maritime law); *Tameny v. Atlantic Richfield Co.,* 27 Cal.3d 167, 610 P.2d 1330, 164 Cal.Rptr. 839 (1980) (employee discharged for refusal to participate in illegal price-fixing scheme allowed to recover in tort); *Frampton v. Central Indiana Gas Co.,* 260 Ind. 249, 297 N.E.2d 425 (1973) (at will employee discharged for filing workmen's compensation claim may bring tort action against former employer); *Nees v. Hocks,* 272 Or. 210, 536 P.2d 512 (1975) (employee dismissed for

---

**3.** The Uniform Commercial Code provides that "every contract or duty within this Act imposes an obligation of good faith in its performance or enforcement." N.Y.U.C.C. § 1–203 (McKinney 1964 & Supp.1979); *accord,* Restatement (Second) of the Law of Contracts § 205 (1981).

**4.** More traditional theories of avoiding the employment at will rule, such as implied-in-fact promises of job security and detrimental reliance, have also been used. *See* Note, *Protecting At Will Employees Against Wrongful Dis-*

charge, *supra,* 93 Harv.L.Rev. at 1820; *see generally* Annot., Modern Status of Rule That Employer May Discharge At-Will Employee For Any Reason, 12 A.L.R.4th 544, 598–604 (1982). These theories are not readily used in New York because of the statute of frauds. *See, e.g., Savodnik v. Korvettes,* 488 F.Supp. 822, 824 (E.D.N.Y.), *rehearing denied,* 489 F.Supp. 1010 (E.D.N.Y.1980); *Murphy v. American Home Products Corp.,* Sup., 447 N.Y.S.2d 218 (1982).

serving on jury duty entitled to recover in tort).[5]

There are presently no reported New York State appellate court decisions in this emerging area of the law. There are, however, several recent state trial court and federal district court decisions applying New York State law that indicate that New York will adopt the so called public policy exception.

The leading New York State court decision is *Chin v. American Telephone & Telegraph*, 96 Misc.2d 1070, 410 N.Y.S.2d 737 (Sup.Ct.1978), *aff'd mem.*, 70 A.D.2d 791, 416 N.Y.S.2d 160 (1st Dep't), *leave to appeal denied*, 48 N.Y.2d 603, 396 N.E.2d 207, 421 N.Y.S.2d 1028 (1979). *Chin* involved an employee who claimed to have been discharged for holding certain political beliefs and associations. One of the causes of action asserted against the employer was "abusive discharge." In ruling on the defendant's motion for summary judgment, the court noted that New York had not, as yet, recognized abusive discharge as stating a claim, but went on to suggest that such a claim might be recognized if the discharged employee could establish that "(1) there is a public policy of this state that (2) was violated by the defendant." 96 Misc.2d at

1075, 410 N.Y.S.2d at 741. The court concluded under the facts of the case that the plaintiff failed to meet the first part of the test. Summary judgment, consequently, was granted.

There are three other reported New York State court decisions involving claims of abusive discharge. *See Murphy v. American Home Products Corp.*, Sup., 447 N.Y.S.2d 218 (1982); *Fletcher v. Greiner*, 106 Misc.2d 564, 435 N.Y.S.2d 1005 (1980); *Edwards v. Citibank*, 100 Misc.2d 59, 418 N.Y.S.2d 269 (1979), *aff'd*, 74 A.D.2d 553, 425 N.Y.S.2d 327 (1st Dep't), *appeal dismissed*, 51 N.Y.2d 875, 414 N.E.2d 400, 433 N.Y.S.2d 1020 (1980). None of these cases is very instructive. In *Murphy v. American Home Products Corp.*, the court denied a motion to dismiss an abusive discharge claim where a fifty-nine year old accountant had been discharged after twenty-two years of employment with the defendant allegedly because of his age and because of his insistence on revealing certain illegal accounting practices. The decision does not analyze whether claims for abusive discharge are recognized in New York nor does it indicate what the plaintiff would have to establish to recover. The emphasis of the decision,

---

5. The courts have not been consistent in defining what public policies will trigger the exception. *See generally* Annot., *supra*, 12 A.L.R.4th at 582–598. Many courts have interpreted the public policy exception as providing protection to employees only when the discharge has been in contravention of some independent statutory policy. *See* Note, *Protecting At Will Employees Against Wrongful Discharge, supra*, 93 Harv.L.Rev. at 1822. Other courts have taken a broader view. In *Palmateer v. International Harvester Co.*, 85 Ill.2d 124, 52 Ill.Dec. 13, 421 N.E.2d 876 (1981), the Illinois Supreme Court permitted a cause of action brought by an employee who had been discharged for supplying information about a fellow employee to local law enforcement authorities. Recognizing that there was no explicit statutory policy involved, the court ruled that abusive discharge should be extended to judicially conceived and defined notions of public policy. 421 N.E.2d at 478. *See Monge v. Beebe Rubber Co.*, 114 N.H. 130, 316 A.2d 549, 551 (1974) (all bad faith discharges prohibited regardless of whether explicit statutory policy violated).

Some courts have taken a strict view of what public policies will support an action for abu-

sive discharge. In *Adler v. American Standard Corp.*, 291 Md. 31, 432 A.2d 464 (1981), for example, the Supreme Court of Maryland ruled that an employee's allegation that he was fired for reporting fellow employees' payment of bribes, falsification of corporate records, and misuse of corporate funds did not establish a violation of public policy. *See Percival v. General Motors*, 539 F.2d 1126 (8th Cir. 1976) (no relief to employee discharged for refusal to disclose false corporate records); *Campbell v. Eli Lilly & Co.*, 413 N.E.2d 1054 (Ind.App.1980), *aff'd*, 421 N.E.2d 1099 (Ind.1981) (no relief to employee discharged after twenty-five years of employment for reporting superiors' misconduct and questioning the safety of the drugs); *Hinrichs v. Tranquilaire Hospital*, 352 So.2d 1130 (Ala.1977) (no relief to employee discharged for refusing to falsify medical records); *Geary v. United States Steel*, 456 Pa. 171, 319 A.2d 174 (1974) (no relief to employee discharged for objecting to the marketing of a potentially defective product). *See generally* Note, *Protecting At Will Employees Against Wrongful Discharge, supra*, 93 Harv.L.Rev. at 1823–24.

rather, is that the plaintiff should be entitled to some discovery before being put out of court.[6] In *Fletcher v. Greiner*, the court applied the *Chin* analysis, but did so in a manner that would strip *Chin* of any substance. In that case, the plaintiff, a medical technician, alleged that she was discharged for refusing to have sex with the defendant, her employer-doctor. The court dismissed her abusive discharge claim on the ground that there was no violation of public policy because the plaintiff had previously had an affair with the defendant that had since broken off. To permit her claim to go forward, said the court, "would open the floodgates of litigation by countless employees who have emotional affairs with their superiors that subsequently turn sour." 106 Misc.2d at 572, 435 N.Y.S.2d at 1010. In the third case, *Edwards v. Citibank*, the plaintiff alleged that he had been discharged because he had uncovered evidence of illegal foreign currency manipulation. The court dismissed the action. It is not clear from the decision whether the court rejected the *Chin* analysis *in toto* or whether it concluded that the plaintiff had failed to establish that a public policy had been violated.[7]

The federal district court cases that have applied New York law have followed the analysis taken in *Chin*. The leading case is *Savodnik v. Korvettes*, 488 F.Supp. 822 (E.D.N.Y.), *rehearing denied*, 489 F.Supp. 1010 (E.D.N.Y.1980). The plaintiff in *Savodnik* alleged that his employer discharged him solely to avoid contributing to the plaintiff's retirement plan. Applying *Chin*, Judge Platt concluded that New York had a strong public policy favoring the integrity of pension plans and that to discharge an employee to avoid contributing to a plan violates this public policy. 488 F.Supp. at 826; *accord, Hovey v. Lutheran Medical Center*, 516 F.Supp. 554 (E.D.N.Y.1981) (allegation that employee's discharge was motivated solely to reduce employer's obligations under the plaintiff's pension plans sufficient to withstand motion to dismiss); *see Placos v. Cosmair, Inc.*, 517 F.Supp. 1287, 1289 (S.D.N.Y.1981) (motion for summary judgment denied when plaintiffs alleged that they were discharged in violation of the Age Discrimination Employment Act);[8] *Shaitelman v. Phoenix Mutual Life Insurance Co.*, 517 F.Supp. 21, 24 (S.D.N.Y.1980) (New York public policy that every contract contains an implied covenant of good faith insufficient to trigger *Chin* doctrine).

■ Having reviewed the many recent cases and the academic commentary that these cases have spawned, the Court is persuaded that the highest court of New York will follow the national trend and recognize the public policy exception as defined in *Chin*. To recover, therefore, the plaintiff must establish that "(1) there is a public policy [of New York] that (2) was violated by the defendant." *Chin v. American Telephone & Telegraph, supra*, 96 Misc.2d at 1075, 410 N.Y.S.2d at 741.

■ The difficult question posed by this case is whether the Hospital acted contrary to public policy at the plaintiff's expense by yielding to the Union's demands to discharge Sherman. We know of no successful claim of abusive discharge that has ever gone this far, but in this developing area of the law it would be imprudent at the pleading stage to dismiss categorically the possibility. *Murphy v. American Home Products, supra*, Sup., 447 N.Y.S.2d 218 (1982);

6. The court stated:
 The day may be inevitable when the doctrine of abusive discharge will be a fixed principle in the substantive law of New York....
 This case may or may not prove to be the turning point. The facts alleged by plaintiff, and assumed arguendo by defendant's motion, appear to be quite compelling. They may not, at this juncture, standing alone, be quite sufficient to carry the day for plaintiff to uphold a claim for abusive discharge. But

disclosure proceedings may elicit still further evidence providing additional fabric on the claim.
447 N.Y.S.2d 218 (1982).

7. The only issue discussed on appeal was whether the issuance of an employee manual sets forth conditions of employment. This claim was rejected.

8. 29 U.S.C. §§ 621–634 (Supp. III 1979).

*see* 5 C. Wright & A. Miller, Federal Practice and Procedure § 1357 (1969 & Supp. 1980) (court should be reluctant to dismiss novel theory of liability under Fed.R.Civ.P. 12(b)(6)).

To permit the Hospital to discharge the plaintiff in these circumstances could foster future union coercion.[9] This is particularly so where, as alleged here, the Hospital had legal remedies available to it to prevent a strike.[10] Moreover, we consider it significant that the alleged motivation for the Union's actions was the plaintiff's refusal to engage in preferential hiring and scheduling practices and that the Hospital purportedly knew that this was its motivation. It would have been improper and against public policy for the plaintiff to accede to the Union's demands.[11] It follows that it would be improper and contrary to public policy for the Union to retaliate against the plaintiff for exercising his public duty and for the Hospital, in turn, knowingly to yield to this retaliation. In such circumstances, the Hospital's actions could be said to amount to a retaliatory discharge.

 The Hospital's answer to the plaintiff's allegations is that it was powerless to stop a strike and had an obligation to

its patients to prevent it. Although there may be merit to these defenses, they are not properly considered on a motion to dismiss. *See generally* 5 C. Wright & A. Miller, Federal Practice and Procedure § 1357 (1969 & Supp. 1980). Nor are these matters properly resolved on a motion for summary judgment as many material facts remain in dispute. Although we have serious reservations about the plaintiff's ability to establish that the Union's complaints stemmed solely from his refusal to accede to its preferential hiring and scheduling demands, this is not a proper basis to dismiss an action on the pleadings. *Speed Auto Sales v. American Motors Corp.,* 477 F.Supp. 1193, 1195 (E.D.N.Y.1979). Dismissal is not appropriate unless it appears beyond doubt that "the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957); *Geisler v. Petrocelli,* 616 F.2d 636, 639 (2d Cir. 1980).

**B.** *Breach of Contract*

There are two branches to the plaintiff's breach of contract claim against the Hospital. First, the plaintiff claims that his termination was in violation of the terms of

---

**9.** The plaintiff filed a complaint with the National Labor Relations Board alleging that the Union committed an unfair labor practice when it threatened the Hospital with a strike. The National Labor Relations Board, in turn, filed a complaint against the Union.

Section 8(b)(1)(B) of the National Labor Relations Act, 29 U.S.C. § 158(b)(1)(B), provides that it is an unfair labor practice for a labor union "to restrain or coerce" an employer in the selection of his representative for collective bargaining or adjustment of grievances." The Fifth Circuit has noted that a congressional judgment is implicit in section 8(b)(1)(B) that "relations between an employer and its supervisory personnel should be insulated in full measure from coercive efforts by a labor union." *Int'l Organization of Masters v. NLRB,* 539 F.2d 554, 560 (5th Cir. 1976), *cert. denied,* 434 U.S. 828, 98 S.Ct. 106, 54 L.Ed.2d 86 (1977). Because the plaintiff represented the Hospital at grievance hearings with the Union, the Union's attempts to have the plaintiff fired arguably constituted an unfair labor practice.

**10.** Whether the Hospital indeed had legal remedies available to it to prevent a strike depends on facts that are in dispute. For example, the

plaintiff alleges that the Collective Bargaining Agreement contained a no-strike clause. This Collective Bargaining Agreement expired in June, 1980. It is not clear whether the plaintiff was officially discharged before or after the new Collective Bargaining Agreement (and thus a no-strike clause) went into effect. *Compare* Hospital's 3(g) Statement ¶ 16 *with* Plaintiff's 3(g) Statement ¶ 16.

**11.** Section 2800 of the New York Public Health Law declares that it is the public policy of New York that "[h]ospital and related services ... efficiently provided and properly utilized at a reasonable cost, are of vital concern to the public health." N.Y.Pub. Health Law § 2800 (McKinney 1977). *See Fritz v. Huntington Hospital,* 39 N.Y.2d 339, 348 N.E.2d 547, 384 N.Y.S.2d 92 (1976). The alleged preferential scheduling involved placing an employee on a shift where she was not needed. To permit this would have been a waste of hospital money in return for unproductive labor and contrary to the New York Public Health Law.

the "Employee Handbook" issued by the Hospital. Second, pleading in the alternative to his allegation of tortious abusive discharge, the plaintiff realleges that his termination was contrary to public policy and argues that this gives rise to a breach of contract.

■ There is presently a split of authority as to whether an employee manual or company handbook may become part of an employment agreement to which the employer is legally bound. *Compare Toussaint v. Blue Cross & Blue Shield of Michigan*, 408 Mich. 579, 292 N.W.2d 880 (1980) (manual binds employer); *Cleary v. American Airlines, Inc.*, 111 Cal.App.3d 443, 168 Cal. Rptr. 722 (1980) (same); *Carter v. Kaskahia Community Action Agency*, 24 Ill.App.3d 1056, 322 N.E.2d 574 (1974) (same), *with Mau v. Omaha National Bank*, 207 Neb. 308, 299 N.W.2d 147 (1980) (manual does not bind employer); *Sargent v. Illinois Institute of Technology*, 78 Ill.App.3d 117, 33 Ill.Dec. 937, 397 N.E.2d 443 (1979) (same); *Johnson v. National Beef Packing Co.*, 220 Kan. 52, 551 P.2d 779 (1976) (same); *Shaw v. S. S. Kresge Co.*, 167 Ind.App. 1, 328 N.E.2d 775 (1975) (same). Although the issue is an interesting one, we need not address it because the New York courts have concluded that "[t]he issuance of a manual by the employer . . . does not create an equitable estoppel which would preclude the employer from terminating an employee's employ-

ment except in compliance with the manual." *Edwards v. Citibank, supra*, 74 A.D.2d at 554, 425 N.Y.S.2d at 328.[12] *See Weiner v. McGraw-Hill, Inc.*, 83 A.D.2d 810, 442 N.Y.S.2d 11 (1st Dep't 1981); *Marinzulich v. National Bank of North America*, 73 A.D.2d 886, 423 N.Y.S.2d 1014 (1st Dep't 1980); *Chin v. American Telephone & Telegraph, supra*, 96 Misc.2d at 1073, 410 N.Y.S.2d at 739. *See also King v. Cornell Univ.*, 81 A.D.2d 712, 439 N.Y.S.2d 445 (3d Dep't 1981); *Wernham v. Moore*, 77 A.D.2d 262, 432 N.Y.S.2d 711 (1st Dep't 1980). In light of this authority, the plaintiff's claim that the handbook issued to him by the Hospital establishes conditions of employment or termination must be rejected.[13]

■ The plaintiff also argues that his termination violates public policy and thus constitutes a breach of an employment contract. He acknowledges that this claim is an "alternative analytical approach" to his tort claim and states that he included it only because the New York State appellate courts have not yet defined the parameters of a cause of action for abusive discharge. Plaintiff's Memorandum of Law at 21. Whether a cause of action for abusive discharge should be maintained in tort or contract or both raises difficult questions of law. *See Tameny v. Atlantic Richfield Co., supra*, 27 Cal.3d at 172–79, 610 P.2d at 1332–36, 164 Cal.Rptr. at 841–46.[14] None of

---

12. The decision in *Edwards* was over a dissent by Judge Kupferman who argued that voluntary issuance of employment policies in personnel handbooks may give rise to a "mutuality of obligation which may be enforceable on both parties" and to a quasi-contractual duty preventing an employer from terminating employment except on specifically stated grounds. 74 A.D.2d at 554, 425 N.Y.S.2d at 329.

13. The Court recognizes that it is not bound by the rulings of intermediate appellate state courts on an issue on which the highest court of the state has not spoken. *Harem-Christensen Corp. v. M. S. Frigo Harmony*, 477 F.Supp. 694, 697 (S.D.N.Y.1979). These rulings, however, must be given respect and should not be disregarded unless there is a sufficient reason for doing so. *O'Connor v. Lee-Hy Paving Corp.*, 579 F.2d 194, 204–05 n.15 (2d Cir.), *cert. denied*, 439 U.S. 1034, 99 S.Ct. 638, 58 L.Ed.2d 696 (1978).

14. The only other reported case that discusses whether a cause of action for abusive discharge may be maintained in contract or tort or both is *Pierce v. Ortho Pharmaceutical Corp.*, 84 N.J. 58, 417 A.2d 505 (1980). In that case, the Supreme Court of New Jersey held that both theories of recovery are appropriate—the contract action being predicated upon "an implied provision that an employer will not discharge an employee for refusing to perform an act that violates a clear mandate of public policy" and the tort being predicated upon "the duty" of an employer not to so discharge an employee. *Id.* at 72–73, 417 A.2d at 512.

Tort actions and contract actions are easily confused because they share many similar characteristics. *See* W. Prosser, Law of Torts § 92 (4th ed. 1971). The fundamental difference between them lies in the nature of the interests to be protected and the duties alleged to have been violated. *See id.*; F. Pollock, The Law of Torts 2–4 (12th ed. 1923); T. Cooley, A

the courts that have interpreted New York law have focused on this issue, although we note that those abusive discharge actions that have been allowed to go forward have all been in tort, not contract. *See Savodnik v. Korvettes, supra,* 488 F.Supp. at 824–27; *Placos v. Cosmair, Inc., supra,* 517 F.Supp. at 1289; *Murphy v. American Home Products Corp., supra,* Sup., 447 N.Y.S.2d 218 (1982).[15] Nevertheless, in light of the fact that this claim arises from the same conduct as the tort claim, that we have determined that the tort claim should go forward, and that this issue raises difficult questions of New York law, the Court concludes that the wisest course is to abstain from deciding this legal issue and to permit the plaintiff to maintain his claims both in contract and tort. *See generally Elkins v. Moreno,* 435 U.S. 647, 662–63 n.16, 98 S.Ct. 1338, 1347–1348 n.16, 55 L.Ed.2d 614 (1978) (desirable to have questions of state law decided in the first instance by the state courts); *St. Martin's Press, Inc. v. Carey,* 605 F.2d 41, 44 n.2 (2d Cir. 1979) (federal courts should try to abstain from interpreting unclear state law when the state courts have not yet spoken).[16]

## C. *Prima Facie Tort*

■ New York permits a cause of action in prima facie tort when there has been an "infliction of intentional harm, resulting in damage, without excuse or justification, by an act or series of acts which would be

otherwise lawful." *James v. Board of Education of Central School District No. 1,* 37 N.Y.2d 891, 894, 340 N.E.2d 735, 736, 378 N.Y.S.2d 371, 372 (1975) (Cooke, J. dissenting); *see Wegman v. Dairylea Coop. Inc.,* 50 A.D.2d 108, 376 N.Y.S.2d 728 (4th Dep't 1975), *appeal dismissed,* 38 N.Y.2d 918, 346 N.E.2d 817, 382 N.Y.S.2d 979 (1976). To state a claim, the plaintiff must allege "an exclusive malicious motivation for the acts of the defendant," *Chin v. American Telephone & Telegraph, supra,* 96 Misc.2d at 1073, 410 N.Y.S.2d at 739 (citations omitted), and must plead actual damages. *McCullough v. Certain Teed Products Corp.,* 70 A.D.2d 771, 417 N.Y.S.2d 353 (4th Dep't 1979). The complaint contains these requisite allegations. The motion to dismiss under Fed.R.Civ.P. 12(b)(6) is consequently denied.

■ The Hospital moves in the alternative for summary judgment on the ground that there is no material issue of fact to dispute that the Hospital did not have a malicious motivation for placing the plaintiff on involuntary early retirement. This motion is granted.

A comparison of the Rule 3(g) statements submitted by the Hospital and the plaintiff indicates that there is no dispute that the plaintiff was discharged as a result of coercion exerted by the Union upon the Hospital, that the Hospital made extensive ef-

Treatise in the Law of Torts § 2 (1932). The duty alleged to have been violated in a contract action comes from the contract, the conditions of which are established by the parties to the contract. F. Pollock, The Law of Torts, *supra,* at 3. A tort, in contrast, involves a duty that is general. It is a duty that is fixed by law and owed to a general class of people. *Id.*

There are, of course, practical differences between bringing an action in tort or contract. The most significant difference is in the damages that may be recovered. There are other considerations, however, that may lead a plaintiff to prefer one action over the other. *See generally* W. Prosser, Law of Torts, *supra,* at 618–22.

**15.** The issue was considered tangentially in *Chin v. American Telephone & Telegraph.* In an early part of the decision, the court noted that "[t]here is no cause of action for breach of contract based upon a contract terminable at

will." 96 Misc.2d at 1073, 410 N.Y.S.2d at 739. This implies that the action would be recognizable in tort only. Later in the decision, however, the court stated that the doctrine of abusive discharge "implied by operation of law an additional *condition of the contract." Id.* at 1075, 410 N.Y.S.2d at 740 (emphasis added). This suggests that a cause of action based in contract is appropriate. *Chin,* therefore, is of little help in this regard.

**16.** The plaintiff also argues that a breach of contract action flows from the Hospital's breach of an implied covenant of good faith. *See Fortune v. National Cash Register Co., supra,* 373 Mass. 96, 364 N.E.2d 1251. We do not consider this argument because the plaintiff failed to allege this theory of recovery in the complaint.

forts to resolve the situation, that the Hospital ultimately discharged the plaintiff when it became apparent that approximately 800 of the Hospital's 1100 employees were about to strike, and that the Hospital had to discharge the plaintiff to continue its vital operations. It is clear from these undisputed facts that the Hospital's chief motivation in terminating the plaintiff was to protect itself and its patients. The plaintiff cannot establish in light of these undisputed facts that the Hospital was maliciously motivated to injure him.[17]

### D. Age Discrimination

The undisputed facts of this case indicate that the plaintiff's claim of age discrimination is also without merit. The plaintiff concedes in his Rule 3(g) statement that his dismissal was the result of the Union's strike threats and the Hospital's belief that it had to discharge him to continue its vital operations. Whatever one thinks about the. Hospital's actions, the facts do not support the inference that the termination was motivated by age.

The plaintiff argues that his discharge had "the effect" of age discrimination because he was replaced by a younger person and did not have the opportunity of acquiring the additional vesting benefits that he would have received if he stayed to age sixty-five or seventy. The plaintiff should be aware that the Age Discrimination Employment Act ("ADEA") is not a panacea for all older workers terminated by their employers. *Mastie v. Great Lakes Steel Corp.*, 424 F.Supp. 1299, 1306 (E.D.Mich. 1976). As its title suggests, ADEA is designed to prevent age discrimination.

ADEA claims should not be filed unless the claimant has a good faith belief that he was discriminated against "because of" his age. 29 U.S.C. § 623(a)(1).[18] The Court accordingly grants the Hospital's motion for summary judgment on Count Eight.

### II. Union's Motion to Dismiss

The complaint alleges several causes of action against the Union: conspiracy to commit the tort of abusive discharge, conspiracy to violate the plaintiff's constitutional rights, *prima facie* tort, interference with contractual relations, and interference with an advantageous economic relationship. The Union moves to dismiss these claims on grounds that the plaintiff's claims against it are preempted by the exclusive jurisdiction of the National Labor Relations Board ("NLRB") and that the plaintiff's claims are barred by the statute of limitations of the National Labor Relations Act ("NLRA") § 10(b), 29 U.S.C. § 160(b) (1976). Although the Union has not moved to dismiss for failure to state a cause of action or for summary judgment, the Court dismisses *sua sponte* the causes of action for *prima facie* tort and conspiracy to violate the plaintiff's constitutional rights for the reasons discussed above. *See* pt. 1 *supra*.[19] With respect to the other causes of action, the Court concludes that these claims are not preempted and that they are not time barred.

### A. Preemption

Any discussion of preemption in the field of labor law must begin with *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959). In that case, the Supreme Court set

17. We note, moreover, that the plaintiff acknowledges in his memorandum of law that Count Four is unnecessary and should be dismissed if the Court finds that Count Two states a legally recognizable claim. Plaintiff's Memorandum of Law at 25.

18. Both Counts Seven and Eight are dismissed. The plaintiff concedes that Count Seven, alleging a conspiracy under 42 U.S.C. § 1985(c), "rises or falls" with Count Eight, the age discrimination count. Plaintiff's Memorandum of Law at 33.

19. The Union's motives for its actions were certainly different from the Hospital's. We are

uncertain whether they give rise to a claim for *prima facie* tort. *Cf. Murphy v. American Home Products, supra*, Sup., 447 N.Y.S.2d 218 (permitting abusive discharge action but not *prima facie* tort action to go forward). The plaintiff has stated, however, that his claim for *prima facie* tort should be dismissed if the claims for abusive discharge and interference with contractual relations and an advantageous economic relationship were permitted to go forward. *See* note 17 *supra*. Since these claims are going forward, we deem this cause of action withdrawn.

out the general rule of preemption: when an activity is arguably protected or prohibited by the NLRA, the courts must defer the matter to the NLRB unless the issues are of merely peripheral concern to the NLRA or the issues touch "interests so deeply rooted in local feeling of responsibility that, in the absence of compelling congressional direction, the Court could not infer that Congress had deprived the States of the power to act." *Id.* at 244, 79 S.Ct. at 779.

 *Garmon* has since been clarified by a number of Supreme Court cases,[20] the most important of which for this case is *Sears, Roebuck & Co. v. San Diego District Council of Carpenters,* 436 U.S. 180, 98 S.Ct. 1745, 56 L.Ed.2d 209 (1978). In *Sears,* the Supreme Court distinguished arguably prohibited conduct, 29 U.S.C. § 158 (1976) and arguably protected conduct, 29 U.S.C. § 157 (1976). When the preemption issue involves arguably prohibited activities, the critical inquiry is

> whether the controversy presented to the state court is identical to . . . or different from . . . that which could have been, but was not, presented to the [NLRB]. For it is only in the former situation that a state court's exercise of jurisdiction necessarily involves a risk of interference

with the unfair labor practice jurisdiction of the Board which the arguably prohibited branch of the *Garmon* doctrine was designed to avoid.

*Id.* at 197, 98 S.Ct. at 1757–1758 (footnote omitted). Arguably protected activities, in contrast, involve a greater risk of state interference with national labor policy. The preemption issue in these cases hinges on the aggrieved party's ability to present the issue before the NLRB: preemption is necessary "only in situations in which an aggrieved party has a reasonable opportunity either to invoke the [NLRB's] jurisdiction himself or else to induce his adversary to do so." *Id.* at 201, 98 S.Ct. at 1759.

 This case comes within the "arguably prohibited" branch of the *Garmon* doctrine.[21] The plaintiff presently has pending before the NLRB a claim that the Union's strike threats constitute an unfair labor practice because it infringed upon the Hospital's selection of its own representative for the adjustment of grievances. *See* note 9 *supra.* The Union makes no claim that this conduct was arguably protected.[22] Our inquiry, therefore, must focus on whether the claims before this Court are identical to those before the NLRB. *Sears, Roebuck & Co. v. San Diego District Council of Carpenters, supra,* 436 U.S. at 197, 98

20. *See Amalgamated Ass'n of St., Electric Ry. & Motor Coach Employees v. Lockridge,* 403 U.S. 274, 91 S.Ct. 1909, 29 L.Ed.2d 473 (1971); *Int'l Ass'n of Machinists & Aerospace Workers v. Wis. Employment Relations Comm'n,* 427 U.S. 132, 96 S.Ct. 2548, 49 L.Ed.2d 396 (1976); *Farmer v. United Brotherhood of Carpenters & Joiners,* 430 U.S. 290, 97 S.Ct. 1056, 51 L.Ed.2d 338 (1977).

21. In addition to the arguably prohibited or arguably protected rule of *Garmon* and *Sears,* there is another route to preemption for cases in which the challenged conduct is neither arguably prohibited nor protected under the NLRA. In those cases, the court must first determine whether Congress intended to leave the challenged conduct beyond all governmental regulation. If the court finds such an intent, the matter is preempted unless the court further finds that one of the recognized exceptions to preemption applies. *Palm Beach Co. v. Journeymen's & Prod. Allied Services Local 157,* 519 F.Supp. 705, 709–10 (S.D.N.Y.1981). *See New York Tel. Co. v. New York State Dep't of Labor,* 440 U.S. 519, 99 S.Ct. 1328, 59

L.Ed.2d 553 (1979); *Int'l Ass'n of Machinists & Aerospace Workers v. Wis. Employment Relations Comm'n,* 427 U.S. 132, 96 S.Ct. 2548, 49 L.Ed.2d 396 (1976). *See also* Cox, *Recent Developments in Federal Labor Law Preemption,* 41 Ohio St. L.J. 277 (1980).

22. Employee protest over supervisory changes may, under certain circumstances, be protected under section 7 of the NLRA. *See Puerto Rico Food Prod. Corp. v. NLRB,* 619 F.2d 153 (1st Cir. 1980); *Abilities & Goodwill, Inc. v. NLRB,* 612 F.2d 6 (1st Cir. 1979). *See generally* Annot., *Concerted Activity Over Supervisory Changes as Protected by the NLRA,* 30 A.L.R. Fed. 626 (1976 & Supp.1980). To be protected, the protest must be over actual conditions of employment and the means of protest must be reasonable. *Puerto Rico Food Prod. Corp. v. NLRB, supra,* 619 F.2d at 155–56; *Abilities & Goodwill, Inc. v. NLRB, supra,* 612 F.2d at 9. Threats of violence and strikes are generally not protected. *Id. See generally* Kheel, Labor Law § 9A.04[2][d] (1981 & Supp.Dec.1981).

S.Ct. at 1757. The Court concludes that they are not identical; consequently, the plaintiff's claims against the Union are not preempted.

 The narrow issue before the NLRB is whether the Union's strike threats amount to an unfair labor practice. The claims against the Union in this Court are much broader. The root of these claims, whether they be characterized as a conspiracy to commit the tort of abusive discharge or tortious interference with contract and advantageous economic relations, lies in the allegation that the Union retaliated against the plaintiff for refusing to cooperate with the Union's improper preferential hiring and scheduling demands. The focus of these claims is on the Union's motivation and on the Union's conduct vis-a-vis the plaintiff and not only on the Union's conduct vis-a-vis the Hospital.[23]

**B.** *Statute of Limitations*

 Plaintiff's action for abusive discharge does not derive its essence from the NLRA as defendant contends; therefore, the six-month statute of limitations for unfair labor practices under the NLRA is not applicable. Plaintiff's claim was asserted well within the New York three-year property damage statute of limitations, N.Y.Civ. Prac.Law & R. § 214.[24] Defendant's mo-

tion to dismiss on the grounds that plaintiff's claim is barred by the six-month statute of limitations of the NLRA § 10(b), 29 U.S.C. § 160(b) (1976) is accordingly denied.

In summary, the motions to dismiss Counts Four, Seven, and Eight are granted. The motions to dismiss Counts One, Two, Three, Five and Six are denied.

SO ORDERED.

---

**23.** The Court recognizes that business torts such as those asserted by the plaintiff, are generally preempted by the NLRB. *Palm Beach Co. v. Journeymen's & Prod. Allied Services Local 157,* 519 F.Supp. 705, 716 (S.D.N.Y. 1981). Even business torts, however, are not to be preempted when "an economic injury, because of its widespread impact on the community as a whole, raises a sufficient state interest to make a case for holding that the state tort law survives preemption." *Id.* at 714. *Accord, Peabody Galion v. Dollar,* 666 F.2d 1309 (10th Cir. 1981) (statute permitting cause of action for abusive discharge when worker discharged for filing workmen's compensation claim not preempted because action has widespread community impact). In this case, the plaintiff's claims, if proven, would have a broad impact upon the community. *See* pt. I *supra.* To permit the claim against the Hospital to go forward, but not the claims against the Union, would be unfair and lacking in common sense.

**24.** N.Y.Civ.Prac.Law & R. § 213(1) and (2) (McKinney 1972 & Supp.1980), respectively,

provide six-year statutes of limitations for actions for which no limitations are specifically prescribed and for actions pertaining to contractual obligations. These provisions arguably control this action because abusive discharge is a new cause of action and because contractual obligations are involved. This Court, however, relies on N.Y.Civ.Prac.Law & R. § 214(4) (McKinney 1972), the three-year property damage statute of limitations, because the cause of action is essentially an action for inducing breach of contract which is properly governed by § 214(4). *Rolnick v. Rolnick,* 29 A.D.2d 987, 290 N.Y.S.2d 111, *aff'd,* 24 N.Y.2d 805, 248 N.E.2d 442, 300 N.Y.S.2d 586 (1968); *see also Frigi-Griffin, Inc. v. Leeds,* 52 A.D.2d 805, 383 N.Y.S.2d 339 (1976); McLaughlin, Practice Commentary to N.Y.Civ.Prac.Law & R. §§ 213, 214 (McKinney 1972 & Supp.1980). Whether the three or six-year statute applies is not of great significance as this action has been commenced within three years.